20-5869 USA v. Dale Emmons 20-5890 USA v. Gerald Lundergan Oral argument not to exceed 10 minutes for each defendant, 20 minutes for plaintiff. Mr. Shanmugam for Appellant Lundergan. Good morning and thank you Chief Judge Cole. Kenneth Shanmugam of Paul Weiss for Appellant Gerald Lundergan and I've May it please the court. This case involves an unprecedented prosecution of a father for making alleged contributions to his daughter's campaign through the family's company. Under the First Amendment, the ban on corporate campaign contributions is unconstitutional as applied to payments from a closely held family-run company because the government has failed to show that such payments pose a risk of quid pro quo corruption. But even if the court concludes that the ban is constitutional as applied, it should still vacate Mr. Lundergan's convictions. As the District Court recognized the critical issue in determining Mr. Lundergan's guilt was whether the payments constituted regulable contributions or constitutionally protected expenditures. But despite recognizing the importance of avoiding confusion on that issue, the District Court gave instructions that blurred that fine distinction, creating the danger that jury convicted Mr. Lundergan based on payments that were not made to the campaign. The government does not argue that any instructional error was harmless. What is more, the District Court improperly admitted evidence involving Mr. Lundergan's conduct during prior and subsequent state election campaigns. The government proceeded to ride that evidence for all that it was worth, highlighting the inflammatory details of the conduct. The admission of that evidence distracted from the thin evidence of the required specific intent, and it poisoned the well by encouraging the jury to engage in impermissible propensity reasoning. This was a close case and the District Court's errors were either conceitably or undoubtedly prejudicial. Mr. Lundergan's convictions should be reversed or vacated. On the constitutional issue, I think I would say just two things very quickly. First, the reason why the ban as applied to these sorts of contributions fails closely drawn scrutiny is quite simply because it's the family relationship that would lead a candidate to favor a family member, and the government bears the burden of making the showing that the ban is closely drawn to serve the interest in preventing quid pro quo corruption, and yet the government cites not a single case of quid pro quo corruption involving intrafamilial contributions. Instead, the government simply cites cases in which politicians have acted corruptly for the benefit of family members, and not surprisingly, the government cites not a single prosecution that is even remotely on all fours with the prosecution here, and while the government relies on dictate in a footnote in Buckley versus Vallejo, the court recognized in the text of Buckley itself that the governmental interest in preventing corruption has less force in the context of the use of funds provided by family members, and I think everyone is in agreement the validity of... I was waiting for a pause to get a question in, but I don't think you're going to pause, so forgive my interruption here. The anti-nepotism cases cited by the government, did any of those, some of those campaign finance violation cases? I don't think so, or at least they're not cases in which there are campaign donations that run from a family member to the candidate. They're all cases in which, for instance, you know, in the Reed case, a district attorney is soliciting funds to hire his son, or the Skelos case, a state senator is trading a vote in exchange for payments to his son, and as we say in our brief, we've identified only three criminal prosecutions in 20 years involving family members, and they were all cases, Judge Clay, that involved blatant misrepresentations or broader schemes to defraud some additional conduct beyond the mere contribution. Now, because my time is short, I do want to turn to the two remaining errors in this case, and in particular to focus on the instructional error, because I think that that error was really critical and concededly prejudicial. There were really two problems with the instructions, and to go directly to the language of the instructions, which can be found on R8677 and R8678, I want to specify the two problems. The first is in the very first relevant sentence in the definition of contributions, the introductory sentence, which reads, and I'm quoting, the law treats direct contributions of money or things of value and contributions made by way of expenditures for the benefit of the regulated and independent expenditures which cannot. By referring to contributions made by way of expenditures, the court essentially characterized expenditures as contributions. The second problem is that the instruction contained overbroad definitions of contribution that did not make clear that a contribution has to be made to a candidate or campaign, and if you read on on R8677, you see the definition that says the term of contribution includes, and I'm omitting some language, anything of value made by any person for the purpose of influencing any election for federal office, and to be sure, these instructions include statutory language, but this is an area in which so much of the relevant law is court-made. The Supreme Court over decades has imposed restrictions. Let me ask you this, though. If expenditures can't equate to contributions, then the law is rendered virtually ineffective, wouldn't you say? Well, what the Supreme Court has made clear, Judge Clay, and the court has made this clear since Buckley v. Valeo itself, and so while there are more recent cases, perhaps more controversial cases that stand for this proposition, this goes all the way back to Buckley. The line that the court drew was between contributions, which can be regulated, and expenditures, which can't. There's an exception for coordinated expenditures, which are characterized as contributions, and so when you look at these statutory definitions, you have to interpret them with that Supreme Court case law in mind, because if you look at the definition of contribution, which is in section 30.101 subsection 8, that definition by its terms would seem to include expenditures as well, and I think the district court recognized this, Judge Clay. The district court recognized the problem, that this is an area of the law that is very confusing, and yet the district court gave this instruction, which was frankly just too broad in the way that it defined contribution, and if language that defined independent expenditure, the district court did include that language in the instruction, but that didn't cure the fundamental problem, which was that the definition of contribution was overbroad, and as the district court recognized in Granning-Vale, this was the critical and integral issue in Mr. Lundergan's defense. Now I see I have a minute left, and I do want to hit the issue of the other acts evidence as well, because that evidence was is admissible either as res gesti background evidence or under rule 404b. I think with regard to res gesti, I think the law is quite clear that this evidence does not qualify, it did not illustrate the cause of the charged conduct, it did not complete the story of the conduct. So I think the real question is whether this evidence was admissible under rule 404b. Now we think that this evidence had little probative value as to Mr. Lundergan's intent in 2014, because the 2011 evidence revealed nothing about his state of mind at the time, and the 2015 conduct was significantly different factually. But I think the real reason why the government's argument here fails is under rule 403, because the prejudice from the admission of this other acts evidence substantially outweighed any limited probative value. The government focused heavily on the other acts evidence, it highlighted the inflammatory details, particularly of the 2015 conduct, the bag of cash, the check with the Boy Scouts memo line, and any error here was decidedly not harmless, and not withstanding the single paragraph in which the government tries to argue harmlessness, the other evidence of the criminal intent here, the specific intent required for a criminal campaign finance violation was far from overwhelming and equally indicative of innocent mistake. So we think that because of the instructional error, and the evidentiary errors, the conviction, the conviction should at a minimum be vacated. But of course, we think that because the contribution ban is applied to this conduct was unconstitutional, we believe that the convictions should be reversed. Why isn't your client's actions in 2011 in making similar contributions and expenditures on behalf of his daughter's Secretary of State campaign? Why is it not relevant on the issues of absence of mistake? And intent? I think one of the arguments here is that yes, there were expenditures made early on for her US Senate campaign, but they thought they would be reimbursed, and that they would, the campaign would would pay back your client. But the pattern shows that he did the same thing in 2011, that he made these, a lot of the same types of contributions for Secretary of State campaign. So why, why isn't that relevant as to the issues of intent and lack of mistake, and those issues? Sure. You're allowed under 404B. So Judge Griffin, I think I would grant that the 2011 conduct was more similar to the charged conduct in the 2015 conduct. I think that conduct was still equally reflective of a mistake or misapprehension of the law. And I think it bears underscoring because I think this court has recognized that it's a relevant consideration, that we're talking about conduct in connection with a state election. And, you know, under state law at the time, contributions from LLCs were permitted. And they were subject to limits rather than a ban. You know, we're also talking about contributions to a different party contributions from a different corporation. So you know, I would grant you that an argument could be made that there is at least some modest amount of probative value. But even if you accept that, I would fall back on my point about the rule of 404B, the rule 403 balancing. And I would really point you to both the primary closing by Minister Heavily for the government and the rebuttal by Mr. Boone. And it's pages 9035 to 9036 and 9240 of the record, because I think what's really telling about what the government did is the minute it turned from its lengthy recitation of the relevant conduct to the critical question of intent, this other acts evidence was the first thing that the government turned to Mr. Heavily said, how else do you know that what these defendants were thinking? How else do you know their intent that they did not make a mistake? You have heard evidence that they did the same thing before, and the same thing after. It seems like a good argument to me. And it seems persuasive that the conduct continued. The 2011 conduct continued in 2014. It may be prejudicial, but it's certainly relevant. And it certainly seems to go at the issue of intent, absence of mistake. I mean, critical issues in the case. And sure, it's prejudicial to your client. But I don't see it unfairly prejudicial. That's all. Well, I think that this court's cases do require Judge Griffin that there has to be factual similarity, less the jury. There's a lot, isn't there? I mean, one was the conduct was made in a state Secretary of State campaign. And the second is made in a federal US Senate campaign, but it seems like a lot of a similar conduct. Unfair, it's not not just whether it's prejudicial, but whether it's unfairly prejudicial is the key. Well, on that, Judge Griffin, I would say that even if you disagree with me about the probative value of the 2011 evidence, we still have the 2015 evidence, which involves very different conduct, and which involves the inflammatory details on which the government so heavily relied. And again, I would point you to the closing because I think that's the best evidence of how the government used this evidence. And I would point you to record 9039 to 9040, which is where the government in great detail laid out the check with the Boy Scouts memo line, the bag of cash, the blank check, and so forth. And so even if you disagree with me about 2011, I think that under this court's cases and decisions like Bell and Clay, that this is a pretty straightforward case in terms of just classic rule 403 balancing. Thank you. Thank you. Thank you, counsel. Thank you. We'll hear next from Mr. Collette. Thank you, Your Honor. May it please the court. My name is Matthew Collette from Massey and Gale on behalf of Appellant Dale Emmons. In addition to the legal arguments Mr. Shanmugam has made, I would like to focus on two points specific to Mr. Emmons. The first is that the government did not present sufficient evidence from which a reasonable jury could conclude beyond a reasonable doubt that Mr. Emmons knew or intended that the payments he received from Mr. Lundergan's corporation would not be reimbursed by the campaign. The government agrees that it has to prove that Mr. Emmons knew the payments would not be reimbursed, and it didn't show that here. Government's evidence, in fact, showed that Mr. Emmons had no involvement in campaign finance issues or expenditures or in ensuring reimbursement of corporate payments. Government's overarching theory was that Mr. Lundergan was heavily involved in the day-to-day running of the campaign. He was the campaign finance chair, and the government asserted that Mr. Lundergan was involved in fundraising and finance issues and that campaign staffers to Mr. Lundergan about the need to reimburse corporate payments. In fact, many corporate payments were reimbursed by the campaign, but there's not one shred of evidence that Mr. Emmons knew or intended that the payments he received or facilitated from SR Holding Company would not be reimbursed. Aren't there reasonable inferences to that effect in the evidence? No, I don't think there are, especially in this context. All the government has said is that he must have tried to conceal the payments because campaign folks didn't know about them. These arguments were made to the jury, and the jury didn't buy it. The insufficiency of evidence issue on appeal is whether a reasonable juror could have so ruled. It's a very high standard, and we don't reverse for insufficiency of evidence very often, but you claim this is what we should. You don't, Your Honor, and we recognize this is a very high standard. We think this is one of the cases in which that standard is met. I think it tends to happen in cases like this where you have a minor or secondary defendant brought along for the ride, and the government didn't submit sufficient evidence to prove an essential... Was your client brought along for the ride in 2011 for the Secretary of State campaign? Well, they did introduce evidence of that in this case and used it against him. He's done it before as well. Is that it? He has received payments before. Again, with the 2011 payments, the government made no effort to show that he knew or intended that the payments would not be reimbursed. Mr. Hearst... Were they reimbursed in 2011? No, they were not, but again, Mr. Hearst testified that his 2011 receipts, he assumed they would be reimbursed by Mr. Lemke. The 2011 payments simply pile on insufficient evidence, and just adding volume to something that has no probative value doesn't work. I should add that the government's theory... The government told the jury that Mr. Edmonds lied about the payments to the campaign finance people, but there's no evidence in the record, and the government has not tried to defend that on appeal. There's no evidence in the record to show he made any misstatement or that he made any effort to conceal these payments. Again, all the government says is that certain campaign finance people in the campaign did not know about the payments, but at the same time, in their response to the motion for new trial at page 24, note nine, they assert that the payments to Mr. Edmonds were authorized by an agent of the campaign referring to Mr. Lundergan. What the government has done here is tried to have it both ways, saying Mr. Lundergan was an integral part of the campaign. He was responsible for ensuring that reimbursement was going on. When Mr. Edmonds received payments from him and submitted an invoice to him, he was somehow hiding something from the campaign. Mr. Collette, speaking of these invoices, what's your response to the government's argument that there were these descriptors in the invoices that dealt with consulting services, processing expense, East perhaps, that there was an intent to commit a campaign violation, whereas when the third-party vendors were paid, the descriptor indicated Allison for Kentucky or something to that description in the invoice. Couldn't a jury infer that there was some intent here to violate the law? No, and the government says these were misleading, but there's nothing misleading about them. I think all you need to do is compare these invoices sent to Mr. Lundergan or to the corporation with the invoices that Mr. Edmonds sent directly to the campaign in 2014. The sent invoices saying consulting services retainer in 2013. That's affirmatively misleading or too vague. He sent the exact same worded invoices directly to the campaign for consulting services. His other invoices, as we pointed out in our reply brief, one says Lexington project. The government's own evidence shows there was a women-leading Lexington project going on, East Kentucky project expenses. Again, there was an event, East Kentucky coal legislator's event. If you look at invoices that he sent directly to the campaign in our supplemental appendix, you see one for radio ads in Christian County, Grimes ticket hyphen Hillary, coal miners walk piece. This is the same. The government may think they're too vague and maybe an accountant would think, gee, I'd like to know more. When you just look at what he sent directly to the campaign and what he sent to Mr. Lundergan, which by the way the government says is the campaign, it doesn't add up. It doesn't work. Again, we know this is a high bar, but it was incumbent on the government to show that Mr. Edmonds knew or intended that these payments would not be I know I don't have much time left. I would like to move briefly if I can to the 2011-2015 evidence, specifically the 2015 evidence, which had nothing to do with Mr. Edmonds, but which the government used against him as it did with some of the other things. The government brought Edmonds into evidence that was brought in against Lundergan. The bag of cash, which Mr. Shanmugam mentioned, which is highly prejudicial, the government at page 9240 of the record used it in the same sentence saying Lundergan paid Edmonds and company funds for state expenses in 2015. It's not an innocent mistake. No one would really try to conceal an innocent mistake, like, for example, making an illegal payment in cash, because using cash would be a really, really good way to conceal it. The government didn't have to weave in Edmonds and Lundergan there. The government could have said here's the evidence that we think shows Lundergan had the requisite intent, and then here's the evidence we think shows that Edmonds had the requisite intent, but it didn't do that, and it continued on page 9241 of the record, saying again, bringing in Lundergan and Edmonds, facilitating corporate money. If they did this, and if Lundergan paid cash, you can conclude that both of these defendants knew what they were doing. Thank you, Mr. Collette. Do you wish to reserve some time for rebuttal? Yes, thank you. Okay, thank you. Okay, hear from the government next. Mr. Heberle, if I'm pronouncing that correctly. You are, Your Honor. Thank you. Good morning, and may it please the Court. Your Honor, in this case, the defendants seek to overturn 114 years of settled law based upon a single proposition for which they cite no authority. That proposition, that contributions from a family-owned corporation cannot give rise, by definition, to the possibility of actual or apparent quid pro quo corruption, is contrary to the holdings of two Supreme Court cases. First, Buckley v. Vallejo, in which the United States Supreme Court ruled that contribution limits as to contributions made by family members of the candidate were constitutional under the First Amendment and were justified by Congress's reasonable determination and the strong, important governmental interest in combating quid pro quo corruption and the appearance thereof. In addition, in FEC v. Beaumont, the Supreme Court upheld the Corporate Contribution Ban, which was first passed in 1907 and which is actually the oldest provision of federal campaign finance law, ruling that even as to non-profit advocacy corporations, the corporate contribution ban was constitutional. In this case, Mr. Lundergan owned a for-profit corporation that was engaged in a line of business that is emergency disaster relief that is likely to involve significant interactions with the federal government. Mr. Lundergan made approximately $200,000 in a conspiracy with Mr. Emmons to the campaign of his daughter, Alison Lundergan Grimes. That was in addition to the maximum contributions that Mr. Emmons made, $5,200 in contributions in individual capacity. Those secret $200,000 contributions were made in a variety of ways, both via payments to Mr. Emmons from Mr. Emmons' own consulting services to the campaign, also to Mr. Emmons to reimburse him for payments to third-party vendors who provided goods and services to the campaign, and also directly to third-party vendors who provided goods and services to the campaign. In this case, there was overwhelming evidence of these issues. In this case, the possibility for apparent and actual quote-unquote corruption is clear. Mr. Lundergan has made the point that he's making an as-applied challenge here. We, of course, do not dispute that. But as applied to these facts, we are talking about hundreds of thousands of dollars in secret contributions made by a corporation engaged in a line of business that is likely to involve significant interactions with the federal government to a candidate for the presidency. It is not difficult at all to see how such contributions could give rise to the possibility of actual or apparent quote-unquote corruption. And for that reason, the defendant's argument to that effect should be rejected. In addition, Mr. Shanmugam in his reply brief has raised for the first time an argument about prejudicial spillover, essentially an argument that were this court to reverse on the issue of the FICA violation, count two, that there was such spillover from that count that all the other counts as to the reporting violations, which are based on the defendants causing the campaign to file false reports with the FEC that omitted those corporate contributions, should also be reversed. As an initial matter, because that argument was not raised in the opening brief of the defendants, it should be and it is weighted. However, even if this court were to reach the merits of that argument, I wanted to offer a brief response to it. Essentially, if this court were to reverse on the FICA count two, there would be no prejudicial spillover because the evidence that would be introduced at a trial solely on the reporting violations would be virtually identical to the evidence that was introduced both at the trial below. And that is for the simple reason that in order to establish that a reporting violation occurred, in order to establish that these defendants willfully caused the campaign to require to prove that the defendants knew that they were making contributions that were required to be reported. And so all of their knowledge about the contribution limits and restrictions applicable to corporations would still be relevant to showing that they knew that they had an obligation and the campaign had an obligation to report these things and they did not. It is simply not the case, as the defendants argued in their opening brief, that simply because a contribution is illegal means or simply because a contribution is not illegal means it does not have to be reported. Even contributions that are legal contributions must be reported as the Supreme Court has recognized. There is a separate strong governmental interest in those disclosure provisions. However, the court need not reach the issue because as we have argued in our brief and are arguing here today, the Supreme Court has very clearly held over the past several decades that the exercise of Congress's ability to restrict and prohibit these sorts of contributions, contributions by a corporation, is well established and is not a violation of the First Amendment. And here in particular under these facts, the possibility for apparent and actual corruption is clear. I would like to also address the issue of the jury instructions the defendants have raised. Mr. Shanmugam and his argument made essentially two points as to the jury instructions. The first point was that essentially these jury instructions said that a contribution includes anything of value, any payment or disbursement for the purpose of influencing an election. His argument is, well, that's too broad because that could essentially be an independent expenditure. And we, by the way, make no argument that independent expenditures are unlawful. Those are clearly lawful. But the district court carefully delineated the difference in this case between contributions and independent expenditures. Mr. Shanmugam points to that language about anything of value, any disbursement for the purpose of influencing an election being a contribution, but he ignores what came before it, which is the first sentence of this instruction, which said that it is unlawful for a corporation to make a contribution to a campaign. And that's critical language. And the court reiterated that in the first element of the offense. This is on record page 8677 to 8678. The district court reiterated that in order to find these defendants guilty, the jury had to conclude beyond a reasonable doubt that there was a decision by these defendants to make a contribution. There was a contribution that they caused to be made from a corporation to a campaign. So twice in the instruction, the very first page, the district court made clear contributions must be made to a campaign. And that is the answer to the concern that the, excuse me, the defendants have expressed that the language about contribution is too broad. Read in isolation, they can make that argument. Read in conjunction with the district court's requirement that such contributions be made to a campaign, it is clear that the jury could only convict these defendants upon finding that they And that is the difference between an independent expenditure and a contribution. That is a critical difference that the Supreme Court has recognized since Buckley v. Vallejo. In this case, the jury was instructed that those things of value must be provided to a campaign. In addition, Mr. Shamagam has made the argument that there's a sentence that says there is a difference. The law treats differently contributions that are made by way of goods and services directly provided to a campaign and contributions made by way of expenditures for the benefit of the campaign. Mr. Shamagam referred to that as an introductory sentence. And I agree with that. And that is critical. It is an introductory sentence. It is followed by the word consequently. The district court then elaborates on those definitions. And Mr. Shamagam does not address this, but the district court went into both the definition in detail of what a coordinated expenditure is and what an independent expenditure is, and expressly instructed the jury that a coordinated expenditure is a type of contribution. And by contrast, an independent expenditure is something that corporations can make in unlimited amounts. There was no lack of clarity on this issue. There was no abuse of discretion by the district court in giving this instruction. In fact, the district court was extremely conscientious in devising this instruction, spent approximately a day and a half with the parties devising this instruction and making absolutely clear that these defendants could not be convicted for causing independent expenditures. And that language expressly that the district court provided the jury is on page 8678 of the record. And the district court there stated that a corporation, on the other hand, if there is no coordination, can make unlimited independent expenditures. That is, it can make any purchase, payment, distribution, deposit, or gift of money or anything of value made by any person for the purpose of influencing any election for federal office without coordination. And so there it was clear beyond any doubt to the jury, they could not convict these defendants for causing independent expenditures. And the jury reached the conclusion based on overwhelming evidence that, in fact, these were contributions. These were provisions of things of value directly to the campaign. This was a corporation over and over again, paying for goods and services provided directly to a campaign. This was not an independent expenditure. This was a contribution in the classical sense. And there was no confusion apparent from these instructions. In addition, Mr. Chamagon has made the point a few times that we have conceded that there was somehow prejudice from this instruction. That is incorrect. By contrast, we've actually argued that there was no prejudice from the instruction. And that is for the very simple reason that as I expressed a moment ago, and as we've outlined in our brief, there was throughout this case overwhelming evidence that these were contributions that were made via the provision of goods and services directly to the campaign. This was the primary argument of the government throughout the trial, including in our closing argument. And it was clear to the jury based on overwhelming evidence that there was not even an expenditure analysis required because what we were talking about throughout the trial was the provision of goods and services to the campaign, the payment of vendors to provide goods and services to the campaign, the payment of Mr. Emmons to provide consultant services to the campaign. In addition, I would like to address the rule 404B argument that the defendants have raised in this case. With respect to the 2011 and the 2015 evidence, there has been an argument made by the defendants that the district court abused its discretion by admitting this evidence. And Mr. Chamagon has made the point that the primary, I think, argument that he's making is based on rule 403. So an argument that this evidence was somehow so unduly prejudicial that that undue prejudice substantially outweighed the probative value of the evidence. And not only that, but the district court abused its discretion in finding that that was not the case. To the contrary, on the side of probative value, this was very probative evidence. This trial for approximately five weeks involved these defendants arguing continuously over and accidental error. Things slipped through the cracks, they argued, and they tried to put into evidence through cross-examination during the course of what they characterized as a very hectic and very chaotic Senate campaign that started as sort of an unexpected or at an unexpected time. This evidence as to 2011 and 2015, the Grimes Secretary of State campaigns demonstrated that, in fact, there was no mistake, demonstrated that in three campaigns that were roughly contemporaneous with each other involving Miss Grimes running for office in Kentucky, there were the same pattern of activity that was happening as in the U.S. Senate campaign in 2013 to 2014. And in 2011, the same pattern is apparent where we see funds, substantial funds, hundreds of dollars coming from Mr. Lundergan's businesses to Jonathan Hurst for campaign mailers for the Secretary of State campaign. And we also see payments going to Mr. Emmons for his consulting services to the Secretary of State campaign. And we see him invoicing back to Mr. Lundergan using vague descriptors, again, just like in the U.S. Senate campaign, billing for services, consulting services in a way that does not make apparent that these services involve essentially the consulting services provided to a campaign or providing any detail about the nature of those consulting services, making it vague enough so that it is not apparent to an outside observer exactly what these consulting services involve. Maybe you've answered this or are answering this question, but with respect to this other Act 7, what part of the government's case concerning the defendant's charge conduct was incomplete such that their uncharged conduct from 2011 and 2015 was necessary to, quote, unquote, complete the story? Yes, Your Honor. The issue is to rest guesstide, as the district court recognized, is that there was a common scheme, a common plan of activity happening over an entire period of time involving three consecutive elections. And in fact, the 2011 conduct showed the genesis of Mr. Hurst's concern about Mr. Lundergan's failure to report violations in the past. And the reason why Mr. Hurst, as he testified, was especially careful in 2013 and 2014 to emphasize to Mr. Lundergan continuously that he had to bill the campaign for all of the expenses that Mr. Lundergan's campaign. So there was a direct linkage there as to causation. There was also a linkage as to the actors. These were the same people, Mr. Hurst, Mr. Emmons, Mr. Lundergan, who had formed this relationship, formed this practice in 2011 that continued into 2013 and 2014, and that then continued into 2015. But there was a direct causation there between the 2011 evidence and 2013 to 2014 evidence. But even if this court were not to conclude that there was, that this was rest gesti of the offense, it would still be highly probative of intent and not unduly prejudicial under Rule 404B and admissible for that independent purpose as well, as the district court recognized. The defendants have pointed us to unfair prejudice essentially to the issue of the fact that there was a bag of cash left in Mr. Hurst's couch in 2015. But that is hardly lurid evidence. This is payment via another method, a payment via cash for the same sorts of things that were being paid for via check. But there's no indication that that evidence as to cash payments or as to a check that had the memo line Boy Scouts was somehow so inflammatory that it overrode the jury's capacity to analyze this, analyze this evidence and to reach a conclusion as the district court instructed them to as to the defendant's guilt on the 2013 to 2014 evidence using the other acts evidence only as evidence of intent and other permissible purposes in Rule 404B. And I would like to also address, if I may, the issue of insufficiency of evidence that Mr. Emmons has raised. There are essentially three primary points that we would respond or we would use to respond to Mr. Emmons' argument as to insufficiency. Mr. Emmons essentially argues that no reasonable jury, even drawing all the inferences in the government's favor, could possibly conclude that Mr. Emmons was aware that Mr. Lundergan was not being paid back by the campaign for all of these things, all these payments that Mr. Emmons or that Mr. Lundergan's corporation was sending to Mr. Emmons. The first piece of record evidence that's really significant in that regard is the nature of the transactions themselves. The second is the vague or misleading invoices that Mr. Emmons used to bill Mr. Lundergan. And the third is the fact that Mr. Emmons concealed this from other members of the campaign. So to start with the nature of the transactions, Mr. Emmons is well aware of how to build a campaign for things. We know that because Mr. Emmons did so after he was brought onto the campaign's payroll in 2014. But he didn't build the campaign for things like robocalls and mailings as to these unlawful contributions. He didn't build the campaign for his consulting services in 2013. In fact, members of the campaign thought that he was a volunteer at that time. He billed instead Mr. Lundergan's corporation. And why do that? Why go through the extra step of billing the corporation instead of billing the campaign directly as he knows how to do? So that's point one. Point two, with respect to the sufficiency of evidence here, is the vague and misleading invoices that Mr. Emmons used. Mr. Emmons' counsel, Mr. Collette, just made the argument that the court should compare the invoices that were part of the unlawful scheme with the invoices that Mr. Emmons submitted to the campaign that were legitimate. And I agree with that. Mr. Emmons has filed a supplemental appendix that contains a few of those legitimate invoices. And if you look at those legitimate invoices and compare those to the invoices that were submitted to SR Holding as part of the difference, in the invoices submitted directly to the campaign for legitimate expenses, Mr. Emmons mentioned things like Callison, Lundergan, Grimes. He uses the word Grimes in one of them. He mentions things like robocalls. You will not find the word Grimes or the word robocalls on any of the invoices that were part of the criminal scheme that were submitted from Mr. Emmons' debt, excuse me, to SR Holding. Instead, he invoices in a very vague way or a misleading way in some instances. He says it's for a robocall reimbursement. He says this is a marketing expense for a campaign mailer. He says this is for a East Kentucky project expense. There's nothing explicitly mentioning the campaign. There's nothing explicitly mentioning the type of evidence or the type of, excuse me, service he's providing. And again, that's an indication that he knows what he's doing and he's hiding it. There is an instance when he is attempting to give reimbursed for robocall expenses, over 150,000 robocalls for the Grimes campaign, and he bills that to Mr. Lundergan as a consulting services retainer. And that's simply false. So why lie on the invoice? Why be so vague? The reason is he knows what he's doing is unlawful. And finally, your honors, the third point we would focus on for the sufficiency challenge is the fact that Mr. Emmons never mentioned this, never mentioned the fact that he was being paid by Mr. Lundergan's campaign. And a number of them testified at trial and not one of them said they were aware that Mr. Emmons was not volunteering in 2013. Not one of them was made aware of these substantial payments that Mr. Emmons was making to robocall vendors and to mailing vendors and other vendors on the campaign's behalf and being paid by Mr. Lundergan. He's working in the basement of the campaign headquarters, and yet this issue never comes up despite all of his interactions with the campaign. And for that reason, we would argue the evidence is sufficient. And for all those reasons, we would ask that the judgment will be firm. Thank you. Okay. Thank you, Mr. Heberle. Mr. Shanmugam, you've got two minutes. Thank you, Chief Judge Cole. I want to focus on rebuttal primarily on the instructional error here because this court reviews the accuracy of the instructions de novo. Now, Mr. Heberle has acknowledged that there is a critical difference between contributions which may be regulated and independent expenditures which may not. But with respect, I think he really fails to come to grips with the language on which we rely in the instructions and the problems with that language. Mr. Heberle does not dispute today that the introductory sentence in the instruction appears to conflate contributions and expenditures. And instead, he says, well, the next sentence introduced by consequently goes on to define contributions and to do so appropriately. But that sentence, the primary definition of contribution in the instructions does not include the critical limitation from Buckley that the payment has to be made to the candidate. And it's therefore overbroad. It sweeps in conduct that would indisputably be an independent expenditure. Now, Mr. Heberle goes on to rely on the definition of independent expenditure on the next page on 8678. Now, that's somewhat ironic because he sought to exclude that language from the instruction on the ground that it was unnecessary. But I think that language illustrates the problem. If you look at that language, it overlaps almost completely with the overbroad definition of contribution on the previous page. And so our submission is simply that there was a complete lack of clarity. And I think even a lawyer, nevermind a lay juror would really have been hopelessly confused in attempting to understand this critical distinction. Now, Mr. Heberle today says, well, that error was harmless, but there is no harmless error argument in the government's brief. It's simply nowhere. And our primary defense at trial was about the distinction between contributions and expenditures, namely that Mr. Wundergan did not specifically intend to make unlawful contributions rather than constitutionally protected expenditures. On the evidentiary issue, I think the only thing I would add is that Mr. Heberle is silent about the prejudicial way in which that evidence was used. The references that he himself made to the blank check, the check with the Boy Scouts memo line, and a whole lot of cash. And there's a good reason why the government relied on those inflammatory details. And that's because the argument that there was innocent mistake. And so at a minimum, we think that the conviction should be vacated. And on the constitutional issue, I think I would rely on our briefs. The one thing I would just say very quickly is that while the government says that our argument about spillover prejudice was somehow waived, we argued in the opening brief that the conviction should be reversed or vacated. And when the government tried to draw a distinction with the reporting counts, it was at that point that we naturally made the argument about spillover prejudice. That's not waiver. That's just ordinary appellate briefing. Okay. Thank you. Thank you, counsel. Mr. Collette. Thank you, Your Honor. I have several points regarding this efficiency allegation. Mr. Heberle said, relied on the nature of the transaction and also that Mr. Emmons supposedly concealed the payments. Both of those involve the point that he didn't build a campaign or didn't tell somebody about the payments. And I want to go back to the footnote in the government's response to a motion for new trial. Where the government asserted that the payment, this is a quote, the payments to Emmons were authorized by an agent of the campaign. They were attempting to make a point about Mr. Lundergan, but what they were saying was Mr. Lundergan was an agent of the campaign. That is the theory of their case. Mr. Hearst testified that he viewed Mr. Lundergan both as a boss and as a vendor. And so the notion that he's hiding something from the campaign when he is sending invoices and receiving payments to someone who is both a boss and a vendor for the campaign doesn't work. On the vague and misleading invoices, I would urge the court to take a look. Some of them are indeed more detailed than others, but the ones that I mentioned before in the sent directly to the campaign are equally vague. They just refer to radio ads in Christian County. And it's very similar, if not almost identical to the invoices that he sent to Mr. Lundergan's company. Again, East Kentucky Project referred to a specific project and it's right there in all the government's exhibits. Everyone knew what that project was about. And the same with the Women Leading Lexington Project. They're not as detailed as the government would like, but if you simply look at both of them, you will find that the government's argument doesn't hold up. Finally, I would like to say I definitely disagree that cash payments are not lurid, as Mr. Headley said, especially when they're used against Mr. Emmons, who had nothing to do with them. Okay, thank you, counsel, all three of you for your arguments this morning. We do appreciate them. We'll take the case under submission and you may call the next case.